## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| [UNDER SEAL] | § | |
| | § | |
| *Plaintiff* | § Civil Action No._____ | |
| | § | |
| **v.** | § | |
| | § **FILED IN CAMERA AND UNDER** | |
| | §   **SEAL PURSUANT TO** | |
| | § **31 U.S.C. § 3730(b)(2)** | |
| | § | |
| | §   **DO NOT ENTER INTO PACER** | |
| | §   **DO NOT PLACE IN PRESS BOX** | |
| | § | |
| | §   **JURY TRIAL DEMANDED** | |
| [UNDER SEAL] | § | |
| | § | |
| *Defendant* | | |

COMPLAINT                                                                                          Page 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | § | |
| *ex. rel.* **WILLIAM LOUIS STONE** | § | |
| | § | |
| *Plaintiff* | § | **Civil Action No.**_____ |
| | § | |
| **v.** | § | |
| | § | **FILED IN CAMERA AND UNDER** |
| | § | **SEAL PURSUANT TO** |
| | § | **31 U.S.C. § 3730(b)(2)** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| **STEWARD HEALTH CARE SYSTEM, LLC** | § | |
| | § | |
| *Defendant* | | |

---

## COMPLAINT (QUI TAM)

---

On behalf of the United States of America, Plaintiff William Louis Stone ("Relator ") files this *qui tam* complaint against Defendant Steward Health Care System, LLC ("Steward" or "Defendant") to recover damages resulting from the Defendant's knowing efforts to defraud government-funded health insurance programs by improperly upcharging emergency visits and by using disparate emergency department physician coding to upcharge its facility coding. As a result of their conduct, Defendant reaped substantial and illicit profits at taxpayer expense. Relator alleges:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

2.      The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the False Claim Act authorizes nationwide service of process, Defendant has sufficient minimum contacts with the United States and within the State of Texas, and further, Defendant's principal place of business is located in the State of Texas.

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, resides or has transacted business in the Eastern District of Texas.

4.      Substantially the same allegations or transactions as alleged in this action have not been publicly disclosed in a Federal criminal, civil or administrative hearing in which the Government or its agent is a party; in a congressional, Governmental Accountability Office or other Federal report, hearing, audit or investigation; or from the news media.

5.      To the extent that there has been a public disclosure unknown to the Relator, the Relator is an original source under 31 U.S.C. § 3730(e)(4). Relator is an individual who (1) prior to any public disclosure voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, and/or (2) who has direct knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing this action.

## INTRODUCTION

6.      This is an action to recover damages and civil penalties on behalf of the United States of America for Steward's conduct in at least the States of Texas, Massachusetts, Pennsylvania, Ohio, Florida, Arkansas, Louisiana, Arizona, Colorado and Utah arising from false

or fraudulent claims and statements made or caused to be made by Defendant to the United States in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* The false or fraudulent claims, statements and records at issue involve payments made by government-funded health insurance programs, such as Medicare, for services purportedly provided by Defendant.

7.        In general, the FCA provides that any person who knowingly submits or causes to submit to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,000 and $10,000 for each such claim, plus three times the amount of damages sustained by the Government. The Act empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in the recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join the action.

8.        Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from false and fraudulent claims, supported by false statements, Defendant submitted or caused to be submitted to government-funded health insurance programs.

## PARTIES

9.        Relator is a registered nurse and a nurse billing auditor for emergency department facility services with extensive nursing and compliance experience.  Relator has been a registered nurse for 28 years.  He worked at Wadley Regional Medical Center, Texarkana, Texas, ("Wadley") for most of his career, and in coding and billing as a nurse auditor for seven years. His role was to audit billing and verify the medical documentation

in each patient's record to support the coding and billing. He resigned his position with Defendant on September 9, 2020.

10.      Relator brings this action for violations of the FCA on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(l). He has direct and independent knowledge of the claims contained herein.

11.      Defendant Steward is a Delaware limited liability company with its headquarters located in Dallas, Texas. Steward may be served through its agent for service of process: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136. Steward is the largest private, for-profit hospital operator in the United States. Steward operates thirty-seven (37) hospitals in at least ten states:  Texas, Massachusetts, Pennsylvania, Ohio, Florida, Arkansas, Louisiana, Arizona, Colorado and Utah. The conduct alleged throughout this Complaint is asserted as occurring in at least these identified states.  As an operator, Steward leases hospitals, rather than own them. But for all purposes related to this case, Steward is responsible for patient administration, services, and billing in its hospitals. Steward is the operator of Wadley in Texarkana, Texas.

## BACKGROUND ALLEGATIONS

**Government-funded Health Insurance Programs:**

12.      Defendant's wrongdoing was committed against government-funded health insurance programs, including, without limitation, Medicare.

13.      Medicare is a federally-funded health insurance program primarily benefiting the elderly. It was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare is administered by and through Centers for Medicare & Medicaid Services ("CMS").

**Emergency Department Coding Guidelines:**

14.     CMS expects that each hospital's internal guidelines for emergency department

(ED) when coding its services should:

> (a)     Follow the intent of the Current Procedural Terminology (CPT) code descriptor in that the guidelines should be designed to reasonably relate the intensity of the hospital resources to the different levels of effort represented by the code;
>
> (b)     Be based on hospital facility resources, not physician resources;
>
> (c)     Be clear to facilitate accurate payments and be useable for compliance purposes and audit;
>
> (d)     Meet Health Insurance Portability and Accountability Act (HIPPA) requirements;
>
> (e)     Require only documentation that is clinically necessary for patient care;
>
> (f)     Not facilitate upcoding or gaming;
>
> (g)     Be written or recorded, well documented, and provide the basis for selection of a specific code;
>
> (h)     Be applied consistently across patients in the clinic or emergency department to which they apply;
>
> (i)     Not change with great frequency;
>
> (j)     Be readily available for fiscal intermediary or, if applicable, Medicare Administrative Contractors' (MAC) review; and
>
> (k)     Result in coding decisions that could be verified by other hospital staff, as well as outside sources. Losewski, Ted:   "Principles for Emergency Department Coding Guidelines," Journal of AHIMA 79, No. 9 (September 2008):  76-78.

**Billing Overrides and Upcharging:**

15.     Wadley, operated and managed by Steward, used the Cerner system for

generating emergency room medical billing. The Cerner system is programmed to comply with

each of the eleven guidelines set forth in paragraph 14.

COMPLAINT                                                                                   Page 6

16.     The Cerner system has specific policy guidelines for circumstances when a Cerner generated bill is to be overridden. To begin, the provider is advised that the overriding of a visit level generated by the Cerner system should be an infrequent occurrence. The system further advises that data regarding overrides "shows that overriding the visit level occurs less than one percent of encounters." *See* Cerner: Understand Facility Charging Algorithm Guidelines; November 05, 2018; p. 20.  Cerner further recommends:

> [T]hat each facility develop and document an internal protocol or guideline for when it is acceptable to override a visit level and that coding or emergency department management personnel be involved in this decision.  This guideline should be documented in the hospital's Client Coding Guidelines (CCGs) so that the override function is used consistently by all staff.  *Id.*

17.     The Cerner override policy states that the coder can override the visit to a lower level, but notes, "It is never appropriate to override to a higher level than what automatically calculated." The Cerner algorithm considers resources expended by all staff, not just nursing.  It would be rare for the algorithm to misassign to a lower level than the final point total justified. *Id.* at pp. 20-21.

18.     The Cerner system emphasizes individual familiarity of the coders as being crucial to performing the task and, thereby, establishing the medical necessity justifying the bill. Cerner instructs that the individual must be thoroughly familiar with the Presenting Problem List. The Cerner Best Practices for selecting a presenting problem list as identify the real reason the patient presented to the facility. This is usually the chief complaint based upon the clinician's interpretation and should be verified for accuracy by reviewing the nursing or physician clinical notes. Cerner further instructs that the coder must be certain that the documentation supports the code assignment, but they should not search out additional information to code the highest level possible when it is not medically necessary.  *Id.* at Cerner Guidelines; pp. 11-13, 23.

**Facility Critical Care Billing vs. Physician Critical Care Billing:**

19.      As of 2011, hospitals separately report ancillary services and associated charges when provided in conjunction with critical care. Since the implementation of the Outpatient Prospective Payment System (OPPS), the Centers for Medicare has required hospitals to report facility resources for emergency department (ED) visits using CPT evaluation and management (E/M) codes. However, CMS recognized that CPT E/M codes do not adequately describe the intensity and range of ED services by hospitals because they reflect physician activities. Therefore, CMS instructed hospitals to develop their own internal guidelines for coding and reporting ED visits.

20.      Two of the best known models for ED visit levels are the AHA/AHIMA Guidelines and the American College of Emergency Physicians ED Facility Level Coding Guidelines (ACEP Guidelines). During its consideration of various available guidelines, CMS identified four basic models in use:

- Guidelines based on the number or type of staff interventions.   Both the AHA/AHIMA Guidelines and the ACEP Guidelines fall into this category. Intervention models use basic care interventions to report the lowest level of service, with higher levels assigned as complexity or number of nursing and ancillary staff interventions increases.

- Guidelines based on time spent with the patient.  As time spent with the patient increases, so does the level assigned.

- Guidelines based on a point system. The time, complexity and type of staff required determine the number of points assigned to each intervention.

- Guidelines based on patient severity.  The diagnoses, level of medical decision making and presenting complaint or medical problem are used to correlate resource consumption

21.      Regardless of the model, guidelines should reflect the hospital resources used in providing the service. CMS recognizes that the E/M level reported by the hospital will not necessarily equate to the level reported by the physician for physician services provided for the

same encounter. Therefore, facilities should code a level of service based on facility resource consumption, not physician resource consumption. This includes situations where patients may see a physician only briefly, or not at all.

22.     CMS makes clear that hospital guidelines must reasonably relate the intensity of hospital resources to the levels of effort represented by the codes.

23.     While the healthcare industry continues to operate without national guidelines, CMS expects that each hospital's internal guidelines should adhere to the eleven guiding principles set forth in Paragraph 14 and which are programmed into the algorithm in the Cerner system.

24.     CMS states that the level of service for emergency and clinic visits should be determined by resource consumption that is not otherwise separately payable.

25.     In the 2008 OPPS final rule, CMS stated, "In the absence of national visit guidelines, hospitals have the flexibility to determine whether or not to include separately payable services as a proxy to measure hospital resource use that is not associated with those separately payable services." However, hospitals must be able to substantiate any decision to include otherwise separately payable services as a determining factor in the ED level assignment and be able to clearly articulate why those services reflect a proxy for additional hospital resource consumption.

26.     Hospitals should subtract from the critical care time any separately reportable procedures, such as CPR and drug administration. They should not report separately those procedures included in the CPT definition of critical care.

27.     Hospitals also should report face-to-face critical care time provided by physicians or hospital staff. If multiple staff members or physicians are providing the service simultaneously, the time involved can only be counted once.

28.     Hospitals continue to develop their own internal guidelines for reporting ED facility visits. The impact on compliant billing practices is broad. CMS expects hospitals to maintain, update, and provide ongoing education to their providers regarding the internal guidelines they have developed, while following the CMS clear directives.

**Services Must be "Medically Necessary" and Fully Documented:**

29.     CMS requires, as a condition of coverage, that services be reasonable and medically necessary.   42 U.S.C. § 1395y(a)(l)(A). Providers must provide economical medical services and, then, provide such services only where medically necessary.  42 U.S.C. § 1320c-5(a)(l). Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6),(8).

30.     Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any ... payment under a Federal health care program." *See* 42 U.S.C. § 1320a-7b(a)(l). Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to Medicare to disclose those omissions or errors to the Government. *See* 42 U.S.C. § 1320a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See, e.g.,* 42 C.F.R. §§ 1003.105, 1003.102(a)(l)-(2).

31.     In order to establish eligibility to receive reimbursement from the Medicare program, CMS requires all hospitals to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-855A Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>                 *        *        *
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Medicare Provider Agreement*, Sec. 15 (Certification Statement) at ¶¶ 4, 6 (CMS-855A Enrollment Application (07-11)).

32.     In order to establish eligibility to receive reimbursement from the Medicare program, CMS requires all physicians to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-8551 Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application.  The Medicare laws, regulations and program instructions are available through the fee-for-services contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>                 *        *        *
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Medicare Provider Agreement*, Sec. 15 (Certification Statement) at ¶¶ 4, 8 (CMS-8551 Enrollment Application (07-11)).

33.     Defendant, as a participant in the Medicare program, signed and submitted to CMS the Medicare Provider Agreement (CMS-855A) indicating its agreement to be bound by the laws and regulations governing Medicare reimbursement for services.

34.     Medicare requires providers to submit claims on paper or electronically using universal billing formats. Regardless of the format used, a provider's obligations to Medicare remain the same.

35.     Beginning in 2007, paper claim submissions have been made using Medicare's UB-04 Uniform Bill (CMS 1450). The UB-04 (CMS-1450) notifies the provider, such as Defendant, as follows:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

The form also requires entities submitting a claim to verify:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts…

36.     To submit claims electronically, which most providers, including Defendant, are required to do, a provider must enroll in Medicare's Electronic Data Interchange (EDI) program. The enrollment process provides for the collection of the information needed to successfully exchange EDI transactions with Medicare and establishes the expectations of the parties to the exchange. The unique EDI number issued to a provider, along with its password, acts as the provider's electronic signature for claim submission.

37.     As part of the EDI enrollment process, a provider is required to certify, among other things, that "it will submit claims that are accurate, complete and truthful," that "it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or cause to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law," and that "it will research and correct claim discrepancies." To complete its EDI enrollment, a provider representative must "certify that I have been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare program . . . and to commit the provider to abide by the laws, regulations and the program instructions of Medicare."  *See* Medicare Claims Processing Manual, Ch. 24 § 30.2. Upon information and belief, Relator alleges that Defendant made these or similar certifications.

38.     Once an institutional provider, such as Defendant, has been enrolled in the EDI program, the provider submits Medicare claims electronically using CMS Form 837I. The electronic billing specifications and data elements prescribed by CMS for CMS-837I are consistent with the data elements present on the CMS UB-04 (CMS-1450) paper claim form. In fact, Defendant personnel usually refer to Medicare claim billing documentation as the "UB," regardless of the method by which a claim was submitted to Medicare.

39.     Defendant, as a participant in the Medicare program, submitted its bills for services to Medicare using the UB-04 (CMS-1450), CMS 837I, or their equivalents, containing the language cited herein, or similar language, and indicating their agreement to be bound by the

laws and regulations governing Medicare reimbursement for services, including but not limited to certification of compliance with 42 U.S.C. § 1395y(a)(1(A).

40.     Pursuant to the Medicare Provider Agreements, EDI Enrollment Agreements, UB-04 (CMS-1450), CMS-837I and/or similar documents, by submitting claims for Medicare reimbursement, Defendant certified to CMS that those claims are for services provided in compliance with CMS and federal laws and regulations.

41.     Federal law specifically obligates every provider to return to the United States any payment that it improperly receives. It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs.  42 U.S.C. § 1320A-7b(a)(3).

## SPECIFIC ALLEGATIONS

42.     Steward began an initiative during the summer of 2019 to address significant drops in critical care volumes. In order to make up for the losses and increase critical care revenue, Steward built an "edit" into their system. The edited charges were built in system wide and were fast tracked for a July 10, 2019, rollout to all markets.

43.     During the summer of 2019, Relator began to notice Steward changing the level of treatment classifications in the ED to higher categories for higher charges. He discovered and was informed Steward had put into place a second review process of the Cerner generated bill by a team in Massachusetts. The Massachusetts team was reviewing and editing coding to higher levels in order to enhance revenue. This was a corporate-wide order from Steward's offices in Massachusetts. Steward's goals of revenue enhancement and more capture of critical care caused Defendant to violate the FCA by (a) editing the original algorithm generated charges and submitting higher levels of ER charges at an inordinate rate, and (b) ordering facility critical care

charges to match or mirror the non-comparable physician's critical care documentation. Steward's deliberate and knowing corporate-wide revenue enhancement scheme caused it to intentionally promote and foster a culture of gaming the system and non-compliance for enhanced profit which was intended to and did cause Defendant to falsely and intentionally misrepresent and submit false charges.

**Steward Routinely Reclassified ER Level of Care for Higher Charges:**

44.     Wadley along with other Steward facilities use the Cerner system to input data and retrieve the proper billing and coding for ER services. The Cerner system was in place at Wadley before Steward began operating the Wadley facility. Cerner is a well-recognized IT provider to the medical community with better revenue recovery being one of its primary goals. They promote themselves on their website as follows: "Cerner's Revenue Cycle Management solutions help organizations use automation to streamline operations, reduce administrative functions, control the cost to collect, make sound business decisions and, ultimately, work to create healthier financial outcomes across acute and ambulatory venues."

45.     As the nurse auditor for the Wadley ER services, Relator audited and verified the Cerner charges and matched the proper code to every charge. In the summer of 2019, Steward began directing that the algorithm generated and audited Cerner ED charges be subjected to an extra step using the "NE/Central market tool." All Steward Facilities or at least all Steward facilities that used the Cerner system began undergoing a secondary adjustment/edit as directed by Steward located in Massachusetts. The Steward Massachusetts team would edit level coding, cancel the current claim, and generate a new claim in Cerner. Then the claim would go back to a scrubber to be cleaned. Steward instructed that the changes should not go back to the hospital

coders. This practice was instituted even though the Cerner guidelines clearly stated the charge should <u>never</u> be upcoded and it would be rare for the algorithm to undercode a level for a visit.

46.     During June 2019, Relator began seeing the charges coming back from the Steward Massachusetts team having been edited and reclassified from the Cerner charge to a Massachusetts team upcharge. For example, a Level 3 ER visit would come back as a Level 5 ER visit. Contrary to the Cerner findings that overriding the visit level occurs less than one percent of encounters, Relator was seeing overrides from the Massachusetts team up to 20 times more or approximately 20% of the reviewed charges.  More importantly, the upcharges were in violation of the Cerner guidelines of it is "never appropriate to override to a higher level than what automatically calculates."

47.     Not only did Relator see a dramatic increase in upcharge overrides, he never saw the lowering of a charge via an override, which was supposed to be the only circumstance for an override and then only rarely. In fact, Relator was informed that the Steward Massachusetts team could *only upcharge*.

**Contrary to CMS guidelines, Steward Instituted a Policy of Improperly Charging Facility Critical Care Billing Based on the Separate Documentation and Care Provided by the Physician:**

48.     Steward also implemented an "edit" for critical care charges which had "plummeted" in volumes. Employees were instructed that, "The decision has been made to turn on Critical Care Edits for the entire company."

49.     Steward informed Relator he was using the "wrong criteria" for critical care charges, and he was instructed by Steward to use their central division criteria—which is based upon the physician documentation. Relator had always used CMS and AMA guidelines, and he indicated to his superiors that he would not take responsibility for changing any charge that he

could not support using the CMS and AMA guidelines. He further reminded his superiors that using the physician documentation was wrong because frequently the facility's level of care does not rise to the same level as the physicians. When a physician provides critical care services rarely has the facility staff provided an equal amount of critical care. Relator argued that an outside auditor would summarily reject this type of charge altering as an error.

50.     On June 28, 2019, Relator communicated with his superior regarding the Cerner System properly calculating ED visits and the guidelines for overrides which he believed the new edits to be inconsistent with. His superior responded that same day, "I agreed with you 100%. This directive is coming from Boston."

51.     Steward represented to Relator that facilities are granted leeway to create their criteria, and Steward had chosen to base theirs around the physician documentation when the facility is providing resources for the physician's services. This self-approving rationale appears to be the singular premise upon which Steward relies.

52.     Relator immediately noted and reported to his superiors that there is rarely ever useful documentation from the facility to support a critical care charge on an account.  He further noted that there are many accounts flagged for physician care that do not meet the standards for facility critical care. Further, the nursing documentation is insufficient most of the time to support critical care charges.

53.     Consistent with Relator's concerns, another Steward employee at a different facility asked how they would perform these edits because they had previously had to review the nurse's documentation and interventions to assign critical care time to the facility. The Steward response was the new directive, "Steward bases facility critical care on physician documentation." The employee replied that they were concerned because they had been trained

COMPLAINT                                                                                                      Page 17

and instructed that they could not use physician documentation for facility charges and that facility charges had to be based on nursing documentation. The employee further referred to a PowerPoint presentation from their training.

54.     It was noted on July 10, 2019 that, "Facility coding guidelines are inherently different from professional coding guidelines … As such, there is no definitive strong correlation between facility and professional coding and thus no rational basis for the application of one set of derived codes, either facility or professional, to the determination of the other on a cases by case basis." However, the superior went on to instruct that, "there is no national standard for hospital assignment of E&M code levels … CMS requires each hospital to establish its own facility billing guidelines." The superior then acknowledged the language from OPPS that critical care reportable time is "the time spent by a physician and/or hospital staff engaged in active face-to-face critical care of a critically ill or critically injured patient." The superior further acknowledge if "simultaneously engaged … the time involved can only be counted once."  The CMS guidelines were acknowledged, but not followed.

55.     On July 11, 2010, Relator pushed back again on Steward's new revenue scheme to base facility billing for critical care by essentially rubber stamping it from the physician's billing. He noted that "physician documentation is what triggered the possibility for the facility charge since the care is physician directed. Otherwise, hospitals could make a mint off of ICU care presumably." He then pointed to a specific case that addressed the facility staff and physician being simultaneously engaged. Relator pointed out that the physician would bill for his time, there would be a "paucity" of documentation of clinical care on the facility side, so the bill would be for the same duplicate time if the facility used the physician documentation.

56.     Relator's superior again responded, "… because facility ED level charges are completely defined by each hospital, we can use whatever criteria we deem to encompass resource usage …  Also, these guidelines came from the NE division of Steward and have been vetted by leadership."

57.     Relator continued to express concerns on August 6, 2019, by highlighting that "… the physician is responsible for documenting their time only … this does not mean that the facility staff has provided an equal amount of critical care directly to the patient … unless it is documented sufficiently in the record there is no basis for supporting a critical charge. Period." Again, Relator's superiors at Steward replied, "Hospitals are granted the leeway to create their own facility usage criteria, which Steward has done, by basing it around physician documenting [.]"

58.     Steward's fraudulent conduct and its false billings continued after Relator's warnings and complaints.  Relator alleges, upon information and belief, that Defendant's wrongdoing continues to occur after his employment ended.

**Steward Management Directed that Claims Be Billed Improperly:**

59.     By the summer of 2020, Relator realized that Defendant's leadership would not implement corrections to address the billing fraud. Recognizing that his ethics and effectiveness were undermined and discouraged by the ongoing fraud, Relator resigned his position in September 2020.

60.     Defendant's management at individual hospitals, as well as the corporate level, are aware of these fraudulent practices and encouraged and facilitated the continuing system-wide fraud against government-funded health insurance programs.

61.     The cultural and systemic resistance Relator faced in trying to address problems at Steward were caused by directives from corporate and senior hospital management.

62.     During communications in which Relator participated, Steward's management was identified as the source who instructed the Massachusetts team to institute an edit of the Cerner algorithm and override the program.  The edit only upcharged from the Cerner charges and at an unprecedented rate.  In fact, Steward made no secret they wanted more money generated.  Relator was told "these directives are coming from Boston" and the changes were "system-wide."

63.     Steward intentionally created an "edit" of the algorithm generated Cerner charges. The edit only upcharged, contrary to Cerner guidelines, and did so a dramatically higher rate than the Cerner data indicated. Further, the "edit" did not calculate charges to a <u>lower</u> level as the Cerner guidelines instructed was the only appropriate way to override a charge.

64.     Steward knowingly submitted false claims to Medicare for higher levels of ED care than what were actually performed and originally audited as appropriate. These actions are a clear violation of one or more of eleven CMS guidelines for billing and that CMS uses for audits.

65.     Steward intentionally gamed and edited critical care charges by using physician billing documentation for disparate, unsupported facility billing, knowing that there was not adequate documentation to justify the charges.

66.     Steward knowingly submitted facility critical care charges that were never previously submitted or allowed by Relator and other auditors because they were trained that it was improper and could not be substantiated. Steward has simply gamed Medicare by using disparate physician documentation in order to increase its "plummeting" revenue. This action by Steward is a clear violation of the CMS guidelines that charges be based on hospital facility resources, not physician resources.

67.     Steward knows that CMS will not pay for services that are not "medically necessary" and appropriate (e.g., 42 U.S.C. § 1320c-5(a)(3), 42 U.S.C. § 1395y(a)(1)(A)), or for services provided that are substantially in excess of patient needs (e.g., 42 U.S.C. § 1320a-7(b)(6), (8)).

68.     Based on the above and foregoing, Steward engaged in a scheme whereby they knowingly submitted claims for payment to CMS and the U.S. Government falsely representing that patients were assessed and treated at higher levels in the ED than what were actually provided and which had been previously assessed by the Cerner system at lower levels. Steward knowingly submitted false claims for payment to CMS and the U.S. Government falsely representing that their facility charges were higher than what were actually incurred by improperly using the incomparable physician documentation.

69.     If CMS had known of the falsity of the claims submitted by Defendant, it would not have paid or approved those claims.

70.     By submitting false claims to the Medicare program, Steward falsely certified compliance with Medicare laws (e.g., 42 U.S.C. § 1395y(a)(1)(A)), regulations and program instructions, as set forth in the Medicare Provider Agreement (CMS-855A).

71.     By submitting false claims to the Medicare program, Steward falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form, and/or similar documents that the services were rendered and the claims were submitted in compliance with Medicare laws, regulations and program instructions.

72.     If CMS had known of falsity of Defendant's certification, it would not have paid or approved those claims submitted by Defendant in violation of or noncompliance with those certifications.

73.     Steward knew at the time it submitted the false claims that the services provided under those claims did not comply with Medicare laws, regulations, guidelines and program instructions and that Defendant was not entitled to payment or approval of those claims under Medicare laws, regulations and program instructions.

74.     The United States, unaware of Defendant's wrongdoing or the falsity of the records, statements or claims made by Defendant, paid claims that would not otherwise have been paid or approved.

75.     Based on the material falsehoods contained in Defendant's false claims for reimbursement to the Medicare system, CMS and the United States Government approved and paid claims that would not otherwise have been paid or approved.

## COUNT ONE
### False Claims Act
### 31 U.S.C. § 3729(a)(l)(A)

76.     Relator re-alleges and incorporates by reference the factual allegations contained in the previous paragraphs of this Complaint.

77.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended, more specifically 31 U.S.C. § 3729(a)(1)(A).

78.     By virtue of the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government.

79.     By virtue of the acts described above, Defendant knowingly, falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form and/or similar documents, that the claims for reimbursement submitted or caused to be submitted were for services provided in compliance with Medicare laws, regulations and program instructions.

80.     By virtue of the acts described above, Defendant knowingly concealed the existence of their improper conduct from the United State Government in order to induce payment of false or fraudulent claims.

81.     The United States, unaware of Defendant' wrongdoing or the falsity of the records, statements or claims made by Defendant, paid claims that would not otherwise have been allowed.

82.     If the United States had been aware of the falsity of the claims submitted by Defendant, the United States would not have paid or approved the claims.

83.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO
### False Claims Act
### 31 U.S.C. § 3729(a)(l)(B)

84.     Relator re-alleges and incorporates by reference the factual allegations contained in the previous paragraphs of this Complaint.

85.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended, more specifically 31 U.S.C. § 3729(a)(1)(B).

86.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States Government.

87.     By virtue of the acts described above, Defendant knowingly falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form and/or similar documents, that the claims for reimbursement submitted or caused to be submitted were for provided in compliance with Medicare laws, regulations and program instructions.

88.     By virtue of the acts described above, Defendant knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of their false or fraudulent claims.

89.     The United States, unaware of Defendant's wrongdoing or the falsity of the records, statements, or claims made by Defendant wrongdoing, paid claims that would not otherwise have been allowed.

90.     If the United States had been aware of the falsity of the claims submitted by Defendant, the United States would not have paid or approved the claims.

91.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

**COUNT THREE**
**False Claims Act**
**31 U.S.C. § 3729(a)(l)(G)**

92.     Relator re-alleges and incorporates by reference the factual allegations contained in previous paragraphs of this Complaint.

93.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended, more specifically 31 U.S.C. § 3729(a)(1)(G).

94.     By virtue of the acts described above, Defendant knowingly concealed an obligation to pay or transmit money to the United States Government.

95.     By virtue of the acts described above, Defendant knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

96.     By virtue of the acts described above, Defendant knowingly concealed the existence of their improper conduct from the United States Government in order to conceal and retain payments received as a result of their violations of the Act.

97.     The United States, unaware of Defendant's wrongdoing or the falsity of the records, statements, or claims made by Defendant, paid claims that would not otherwise have been allowed.

98.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## **REQUEST FOR TRIAL BY JURY**

99.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

## **PRAYER**

WHEREFORE, Relator requests that judgment be entered in favor of the United States, and Relator against Defendant, ordering that:

a.     Defendant cease and desist from violating the FCA, 31 U.S.C. § 3729, *et seq.;*

b.      Defendant pay an amount equal to three times the amount of damages that the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of the FCA. 31 U.S.C. § 3729 as adjusted by the Federal Civil Penalties Inflation Adjust Act of 1990;

c.      Relator be awarded the maximum amount allowed pursuant to the FCA, 31 U.S.C. § 3730(d);

d.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to the FCA, 31 U.S.C. § 3730(d); and

f.      the United States and Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Jim Wyly*

_____

JIM WYLY
State Bar No. 22100050
SEAN F. ROMMEL
State Bar No. 24011612
WYLY~ROMMEL, PLLC
4004 Texas Boulevard
Texarkana, Texas  75503
(903) 334-8646 (Telephone)
(903) 334-8645 (Facsimile)
jwyly@wylyrommel.com

ATTORNEYS FOR RELATOR